## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | **No. 22-10297** |
| **Solterra Renewable Technologies, Inc.,** | § | **Chapter 11** |
| | § | |
| *Debtor.* | § | |

---

### DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11, SUBCHAPTER V OF THE BANKRUPTCY CODE

### INTRODUCTION

Solterra Renewable Technologies, Inc., the Debtor and Debtor-in-Possession in the above-captioned Chapter 11 Case, proposes the following Plan of Reorganization. As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided in the Bankruptcy Code, states whether each Class of Claims or interests is impaired or unimpaired, and provides the treatment each Class will receive under the Plan.

ALL INTERESTED PARTIES SHOULD READ THIS DOCUMENT CAREFULLY AND DISCUSS IT WITH THEIR LEGAL AND FINANCIAL ADVISORS.

THE PLAN MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE PLAN, YOU SHOULD IMMEDIATELY CONTACT THE DEBTOR TO RESOLVE THE DISPUTE. IF YOU AND THE DEBTOR CANNOT AGREE, YOU MUST FILE AND SERVE ANY OBJECTION ON OR BEFORE THE DEADLINE SET BY THE COURT AND INDICATED IN THE NOTICE OR ORDER ACCOMPANYING THIS PLAN. IF YOU DO NOT FILE A TIMELY RESPONSE, THE PLAN MAY BE APPROVED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE PLAN AND HAVE NOT REACHED AN AGREEMENT WITH THE DEBTORS, YOU MUST ATTEND THE CONFIRMATION HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY CONFIRM THE PLAN AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

# ARTICLE 1
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1.    **Definitions.** Applicable definitions contained in the Bankruptcy Code are incorporated into the Plan except as modified in this Article 1. The following definitions shall have the meanings as specified herein, and shall be designated, when such special definitions are applicable, with capital letters, and these definitions shall be enforceable as terms of the Plan in conjunction with the respective matters to which they reference or define:

1.1.1.    "Administrative Expense Claim" or "Administrative Claim" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case pursuant to Bankruptcy Code §§ 503(b) or 507, including, without limitation (a) any fees or charges assessed against the Debtor's Estates under 28 U.S.C. § 1930, and (b) other Administrative Expense Claims as may be ordered and Allowed by the Bankruptcy Court.

1.1.2.    "Allowed" or "Allowed Claim" means: (a) a Claim that: (i) has been listed by the Debtor in its Schedules as other than disputed, contingent or unliquidated; and (ii) is not otherwise a Disputed Claim; (b) a Claim (i) for which a Proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date, or otherwise has been deemed timely filed under applicable law; and (ii) that is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any stipulation executed by the Claim Holder and the Debtor, Reorganized Debtor, or Subchapter V Trustee as applicable; (ii) in a Final Order; or (iii) pursuant to the terms of the Plan.

1.1.3.    "Avoidance Actions" means causes of action arising under chapter 5 of the Bankruptcy Code or under related state or federal statutes or common law, including fraudulent conveyance laws, whether litigation has been commenced to prosecute such causes of action which are expressly preserved for the Estate hereunder.

1.1.4.    "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

1.1.5.    "Bankruptcy Estate" means the estate created pursuant to 11 U.S.C. § 541 with respect to the Debtor.

1.1.6.    "Bankruptcy Code" or "Code" means Title 11, United States Code, Section 101 *et. seq.*, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

1.1.7.    "Bankruptcy Rules" means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

1.1.8.    "Bar Date" means the applicable bar date by which a Proof of Claim or request for payment of an Administrative Expense Claim must be or must have been filed, as established by the Notice of Chapter 11 Bankruptcy Case [ECF No. 6] or this Confirmation Order.

1.1.9.    "Business Day" means a day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

1.1.10.    "Cash" means legal tender of the United States of America or its equivalent in immediately available funds.

1.1.11.    "Chapter 11 Case," "Case," or "Bankruptcy Case" means the case under chapter 11 of title 11 of the United States Code pending as *In re Sabine Storage & Operations, Inc.*, Case No. 22-30670, commenced on March 16, 2022, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

1.1.12.    "Claim(s)" means a "claim" against the Debtor, as defined in Bankruptcy Code § 101(5).

1.1.13.    "Claim Objection Deadline" means the later of (a) ninety (90) days after the Effective Date, (b) ninety (90) days after the Bar Date, and (c) such later date as may be ordered by the Bankruptcy Court pursuant to a motion filed prior to the expiration of such ninety (90) day period.

1.1.14.    "Class" or "Classification" means the class designated in the Plan, pursuant to Bankruptcy Code §§ 1122 and 1129, into which the Claims of all Creditors or Equity Interests have been segregated for purposes of voting and distributions.

1.1.15.    "Confirmation" or "Confirmation of the Plan" means the approval of this Plan by the Bankruptcy Court at the Confirmation Hearing.

1.1.16.    "Confirmation Date" means the date on which the clerk dockets a Confirmation Order determining that the Plan meets the requirements of chapter 11 of the Bankruptcy Code, which order has been previously entered by the Court.

1.1.17.    "Confirmation Hearing" means the hearing(s) which will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of this Plan.

1.1.18.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

1.1.19.    "Court" or "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, presiding over the Chapter 11 Case, or, if necessary, the United States District Court for the District and Division having original jurisdiction over the Chapter 11 Case.

1.1.20.    "Creditor(s)" means all creditors of the Debtor holding Claims for debts, liabilities, demands or Claims of any character whatsoever, as defined in Bankruptcy Code § 101(5).

1.1.21.    "Cure Claim" means any Claim based upon the Debtor's default under any Executory Contract to which the Debtor was a party on the Filing Date that has been or will be assumed under Bankruptcy Code § 365 or pursuant to the Plan.

1.1.22.    "Debtor" or "Debtor in Possession" means Solterra Renewable Technologies, Inc. ("Solterra").

1.1.23. "Disallowed" means, with respect to a Claim, Interest, Administrative Expense Claim, or portion thereof, that it is determined by a Final Order that the Claim, Interest, Administrative Expense, or portion thereof is not allowed under Bankruptcy Code §§ 502 or 503.

1.1.24. "Disbursing Agent" means the party appointed as the Disbursing Agent as will be set forth in a Plan Supplement to be filed prior to confirmation and may be the Subchapter V Trustee, the Reorganized Debtor, or an independent third party.

1.1.25. "Disputed Claim" means (a) a Claim, Interest or Administrative Expense that is subject to a pending objection; or (b) until the Objection Deadline:

- a Claim for which a corresponding Claim has not been listed in the Debtor's Schedules or for which the corresponding Claim is listed in the Debtor's Schedules with a differing amount, with a differing classification, or as a disputed, contingent, or unliquidated Claim;

- a Claim which a Debtor in good faith believes is held by a holder either (i) from which property is recoverable by the applicable Debtor under any of Bankruptcy Code §§ 542, 543, 550 or 553 or (ii) that is a transferee of a transfer avoidable under Bankruptcy Code §§ 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) unless the holder has paid the amount, or turned over any such property for which such holder is liable under the terms of Bankruptcy Code §§ 522(i), 542, 543, 550, or 553; and/or

- an Interest for which a corresponding Interest has not been listed in the Debtor's List of Equity Interests or has been listed in a different number (to the extent of such difference).

1.1.26. "Effective Date" means the first Business Day following fourteen (14) days after the Confirmation Date.

1.1.27. "Equity Interest(s)" or "Interest(s)" means all the shares in the Debtor.

1.1.28. "Estate" means the estate created pursuant to Bankruptcy Code § 541 by the commencement of the Chapter 11 Case.

1.1.29. "Executory Contract" shall have the meaning assigned in Bankruptcy Code § 365.

1.1.30. "Filing Date" or "Petition Date" means May 3, 2022, the date upon which the Chapter 11 Case was commenced as a voluntary case under chapter 11 of the Bankruptcy Code.

1.1.31. "General Unsecured Claim" means an Unsecured Claim that is not an Administrative Expense Claim, Priority Tax Claim, or Priority Claim.

1.1.32. "Impaired Class" and "Unimpaired Class" shall have the meaning described in Bankruptcy Code § 1124.

1.1.33. "Insider Creditor" means the following Persons and any of their successors or assigns with respect to a Claim otherwise assertable by such Persons against the Debtor: (a) Stephen Squires, (b) Robert Phillips, and, (c) Quantum Materials Corp.

1.1.34. "Lien" has the meaning set forth in Bankruptcy Code § 101(37).

1.1.35.    "Administrative Expense Claim" means Administrative Expense Claims that are (a) Professional Fee Claims; (b) Subchapter V Trustee Claim; and, (c) unpaid ordinary course expenses if any.

1.1.36.    "Objection Deadline" means the deadline to file objections to Claims with the Bankruptcy Court.

1.1.37.    "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, or entity of whatever nature.

1.1.38.    "Plan" means the Debtor's Plan of Reorganization in its present form or as it may be amended, modified, or supplemented from time to time, together with all exhibits thereto.

1.1.39.    "Plan Supplement" means, including without limitation, the forms of the material documents to implement the provisions of the Plan that are to be filed with the Bankruptcy Court as early as is practicable, but in no event later than five (5) Business Days before the Confirmation Hearing, or on such other date as the Bankruptcy Court may determine. The Plan Supplement is incorporated into the Plan as if fully set forth in the Plan and all references to the Plan refer also to the Plan Supplement.

1.1.40.    "Priority Claim" means any Claim (or portion of such Claim) entitled to priority under Bankruptcy Code § 507 and that is not an Administrative Expense Claim, a Priority Tax Claim, or a Secured Claim.

1.1.41.    "Priority Tax Claim" means a Claim that is entitled to priority pursuant to Bankruptcy Code §§ 502(i) or 507(a)(8) that is not a Secured Claim.

1.1.42.    "Professional" means any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code §§ 327, 328 or 1103 or otherwise, and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code § 503(b).

1.1.43.    "Professional Fee Claim" means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Filing Date and prior to and including the Effective Date.

1.1.44.     "Proof of Claim" means any proof of claim filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002.

1.1.45.     "Property" or "Property of the Estate" means all assets of the Debtor which are property of the Estate pursuant to Bankruptcy Code § 541.

1.1.46.     "Pro Rata Share" means with respect to Claims, the proportion that the amount of an Allowed Claim in a particular Class bear to the aggregate amount of all Claims in such Class, exclusive of Disallowed Claims, but including Disputed Claims.

1.1.47.     "Released Parties" means each of the following, solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; each of such Entity's current and former Affiliates; c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates; and (d) with respect to each of the foregoing parties in clauses 1.1.47(i)(a) through (i)(c), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

1.1.48.     "Releasing Insider Creditor" means Robert Phillips, Stephen Squires and/or Quantum Materials Corp. if they consent to the Plan and vote in favor of the Plan.

1.1.49.     "Reorganized Debtor" means the Debtor on and after the Effective Date, surviving after confirmation of the Plan.

1.1.50.     "Retained Causes of Action" means all causes of action that Debtor, its Estate, or the Reorganized Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or interest in, a Debtor or other entity, including any and all causes of action under Bankruptcy Code §§ 547, 548 and 549 and any derivative claims asserted on behalf of the Debtor, provided that such term does not include any cause of action or Claim against any of the Released Parties. The Retained Causes of Action include but are not limited to any claims against Adli Law Firm or claims related to or arising from the California Litigation.

1.1.51.     "Schedules" and "Statements" means the Schedules, Statements and Lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time

1.1.52.     "Subchapter V Trustee" means the individual appointed as the subchapter v trustee appointed in the Bankruptcy Case, or such trustee's successor appointed to serve as trustee pursuant to Bankruptcy Code § 1183, including such individual after termination of his or her services pursuant to Bankruptcy Code § 1183(c).

1.1.53.     "Timely Filed" with respect to a Claim, Interest or Administrative Expense, means, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court within such applicable period fixed by the Plan, statute, notice, or Court Order.

1.1.54.     "Unimpaired Class" has the meaning described in Bankruptcy Code § 1124.

1.1.55.     "United States Trustee" or "U.S. Trustee" means the United States Trustee for the Southern District of Texas.

1.1.56.    "Unsecured Claim" means any Claim (regardless of whether such Claim is covered by insurance) that is neither secured nor entitled to priority under the Bankruptcy Code, or by a Final Order of the Bankruptcy Court, including, but not limited to: (a) any claim arising from the rejection of an Executory Contract or unexpired lease under Bankruptcy Code § 365, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Bankruptcy Code § 506(a).

1.1.57.    "Unsecured Creditor" means all holders of Unsecured Claims other than holders of Allowed Deficiency Claims.

1.2.    **Rules of Construction.**

1.2.1.    Interpretation. Unless otherwise specified herein, all section, article and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

1.2.2.    Construction and Application of Bankruptcy Code Definitions. Unless otherwise defined herein, words and terms defined in Bankruptcy Code § 101 shall have the same meanings when used in the Plan. Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code. The rules of construction contained in Bankruptcy Code § 102 shall apply to the construction of the Plan.

1.2.3.    Other Terms. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any article, section, subsection, or clause contained in the Plan.

1.2.4.    Time. In computing any period prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2
## INFORMATION REGARDING THE DEBTOR, THE CHAPTER 11 CASE, AND THE PLAN

THE FOLLOWING IS AN OVERVIEW OF CERTAIN KEY INFORMATION RELEVANT TO THE PLAN AND OMITS OTHER DETAILS OF THE PLAN THAT MAY BE IMPORTANT TO YOUR RIGHTS. YOU SHOULD CAREFULLY READ THE ENTIRE PLAN AND SEEK THE ADVICE OF AN ATTORNEY IF YOU ARE UNSURE ABOUT ANY PROVISIONS OF THIS PLAN.

TO THE EXTENT THAT THERE IS ANY INCONSISTENCY BETWEEN A PROVISION IN THIS ARTICLE AND A PROVISION CONTAINED ELSEWHERE IN THE PLAN, THE PROVISION ELSEWHERE IN THE PLAN SHALL CONTROL IN ALL RESPECTS

2.1.  **Background on the Debtor**.

Solterra, a Delaware corporation, was formed in May 2008 by Mr. Stephen Squires, Chief Executive Officer, and other shareholders to develop quantum dot ("QD") applications in the solar cell industry and has engaged in different research and development activities.  Solterra plans to develop applications to print highly efficient photovoltaic solar cells in mass quantities at a low cost.

QDs were first discovered in the early 1980s and the industry has developed to the point where QDs are now being used in an increasing range of applications, including televisions and displays, light emitting diode ("LED") lighting (also known as solid-state lighting), and in the biomedical industry. LG, Samsung, and other companies have recently launched new televisions using QDs to enhance the picture color quality and power efficiency. A number of major lighting companies are developing product applications using QDs to create a more natural light for LEDs. The biomedical industry is using QDs in diagnostic and therapeutic applications.

Pervoskite QDs have applications in solar cells, where their characteristics enable conversion of light energy into electricity with the potential for significantly higher efficiency than existing technologies. In traditional solar cells, a photon can only be converted into a fixed amount of energy per photon, regardless of the photon's total energy. Excess energy is converted to heat which further lowers the efficiency of the panel. QD-based solar cells have the potential to significantly exceed this efficiency because QDs are capable of generating multiple electrons per photon strike rather than converting the extra energy of high energy photons to heat as in the case of traditional solar cells. QD solar cells can also convert the infrared portion of the spectrum that is not absorbed by traditional solar cells. These attributes make the theoretical maximum efficiency of QD solar cells substantially higher than that of traditional silicon solar cells. Solterra believes the use of QDs in solar cells will create the opportunity for a step change in efficiency and performance in printed photovoltaic cells.

Solterra entered into license agreements for patented technology in order to pursue this development, but does not own any patents itself.

Solterra has license agreements with universities to use their patented technology in its research and development. The license agreements provided Solterra exclusive rights to use the patented screen-printing techniques in the production and sale of organic light emitting diodes ("OLEDs") incorporating QDs in printed electronic displays and other printed electronic components among other technology.

Solterra was acquired by Hague Corp. in November 2008, pursuant to a business transaction which was referred to as an "Agreement and Plan of Merger and Reorganization" ("Business Combination" or "Agreement") wherein the shareholders of Solterra were to exchange their shares of common stock in Solterra for shares of common stock in Hague Corp., and Solterra was to become a wholly-owned operating subsidiary of Hague Corp. This transaction was deemed to be an exchange of shares and not a merger for tax and reporting purposes.  The license rights with University of Arizona were transfered to Quantum Materials.

Upon the closing of the Business Combination, Hague Corp. changed its name to "Quantum Materials Corp."  Pursuant to the Agreement, the intent was for Quantum Materials Corp to have 100% ownership of Solterra.

Since the founding of Solterra Renewable Technologies, it has maintained a long-term continuity of purpose continuing to seek investments and engaging in a program of research and development for solar power.  It has received inter-company support from Quantum Materials Corp including leasing of its wet lab, scientists and material engineers.

By the Fall of 2021, Solterra sought investment capital arrangements and potential partners to fund Solterra to further develop as a solar energy business with the goal to provide accessible and affordable and solar power globally with high-efficient conversion rates of photons to electrons. Solterra believes that thin film solar technology offers not only superior solar efficiency but, in addition, offers compelling environmental, sustainability and governance advantages.  As of 2022, the use of non-toxic application-specific quantum dots in the production of solar energy provides a pathway for the mass production of solar modules with a dramatically lower carbon footprint than traditional solar technologies, superior solar conversion performance, and offers a source of energy that can ultimately offer solutions with sustainable and renewable source of energy for a growing array of EV energy needs, digital financial workloads, and a credible form factor to decarbonization and decarbonization of existing grids.

Current research and development efforts continue with a focus on application-specific quantum dots that will meet the multi-year reliability and durability requirements for solar modules.  While product offerings are still some years ahead, Solterra is encouraged by internal innovation results in this area.  Based on internal experience in the lab, Solterra envisions solar energy solutions that will exhibit the following features:

1.  Better materials performance at lower cost with higher levels of solar efficiency
2.  Use of non-toxic and non-hazardous materials, with low carbon, sustainable R2R manufacturing processes that require less power and less water than current high carbon footprint silicon-based solar technologies.
3.  Thin film roll to roll (R2R) production economics support rapid scale-up of manufacturing capabilities and ultimately lower landed cost and cost of deployment
4.  Mass production techniques that can accelerate domestic and global accessibility and affordability for solar power.
5.  Thin film solar modules provide a range of alternative form factors that can be adapted to different architectural requirements and use cases, including transparent solar cells for use in windows and in outdoor agricultural applications.
6.  Form factor advantages of thin film solar include lower carbon recovery for logistics and transport, streamlined residential installation, greater accessibility and use in pre-existing facilities.
7.  Lower total cost of ownership with options for novel refresh and maintenance management strategies to efficiently upgrade solar facilities over time.
8.  Higher solar efficiency and alternative form factors promotes grid decentralization to facilitate advantages such as Electric Vehicle charging stations in off-grid locations.

Solterra and Quantum Materials Corp have been in negotiations for Solterra to license patents that Quantum Materials Corp acquired a patent portfolio from Bayer AG that included patents and patent applications covering the high-volume manufacture of QDs, including heavy metal-free compositions, various methods for enhancing quantum dot performance, and a quantum dot based solar cell technology (the "Bayer Patents"). Solterra's goal is to use this technology as well as in the UA will subsequently be granted license rights to this technology to develop 3rd Generation printed solar cell film.   A license agreement will be provided for in the

Plan Supplement as the negotiations are ongoing but close to a proposed license agreement for Solterra to license Quantum's technology.

As noted above, the Business Combination in 2008 contemplated the shares of Solterra to be exchanged for shares of Quantum Materials Corp. As Solterra increased efforts to bring in new investors to help fund a launch of its solar energy business in late 2021, Solterra discovered a flaw in the handling of the Business Combination.

The Business Combination provided "Upon consummation of the Exchange, Hague will own 100% of Solterra. Solterra's principal asset is a license agreement with William Marsh Rice University." The Business Combination was approved by both the Board of Solterra and Hague Corporation. All of the issued and outstanding shares were not exchanged. This presented problems with completing a proxy of shareholder votes to amend the articles of incorporation as well as presents difficulties with equity investments into Solterra in the present and future. It also presents potential liability problems in the event that the prior owners of the 41,250,000 may assert claims against Solterra due the prior legal transaction error. As such, Solterra plans to seek approval for providing notice of this Plan by publication in Delaware and Texas.

The shareholders of Solterra prior to the Business Combination who received a one to one conversion of shares in Hague Corp now known as Quantum Materials Corp are as follows:

| Name | # of Solterra Shares | # of Conversion Shares |
|---|---|---|
| Stephen Squires | 36,600,000 | 36,600,000 |
| Phoenix Alliance Corp. | 3,000,000 | 3,000,000 |
| Steven Morse | 190,000 | 190,000 |
| Lester Morse | 190,000 | 190,000 |
| Adrienne Grody | 20,000 | 20,000 |
| Barry Laughren | 500,000 | 500,000 |
| Brian Lukian | 750,000 | 750,000 |

While the Solterra shareholders got conversion shares in Hague Corp., the Business Combination did not transfer the actual shares of Solterra to Hague Corp. This left 41,250,00 of issued and outstanding shares of Solterra with the record owner not properly reflected as Quantum Materials Corp. At all times since the Business Combination, Solterra and Quantum Materials Corp operated with the misunderstanding that the shares had been properly transferred pursuant to the Business Combination. However, when Solterra with the cooperation of Quantum Materials Corp was seeking investors for additional growth, the problem was discovered.

Upon the Solterra shareholders getting exchange shares in Quantum Materials Corp, they had no further interest in the Solterra shares although the shares were issued and outstanding as a matter of record to the prior shareholders. Out of an abundance of caution, Solterra will seek to notice the Plan by publication in the event any shares were transferred, assigned or otherwise impacted post-Business Combinationw ithout Solterra's knowledge. The Business Combination did not provide for the mechanism to transfer those shares to Quantum Materials Corp. All of the 41,250,000 shares should have Quantum Materials Corp as the record owner. The shares should have been irrevocably transferred to Quantum Materials Corp with irrevocable assignments or by cancelling the shareholders' certificates and reissuing a new certificate for Quantum Materials Corp. This administrative defect in the Business Combination was only identified recently.

Solterra and Quantum have been jointly discussing and negotiating for some time pre and post-petition with a potential investor Urban Resources Management, LLC and have been working on terms for a confidential term sheet for court approval.  The term sheet anticipates an investment of $15,000,000 to purchase shares of Solterra to further develop its solar film quantum dot production.  The financing is to facilitate an early-stage and investment and completion of a pilot roll to roll printing facility for thin film solar cell film utilizing Solterra and Quantum Materials Pervoskite Quantum Dot technology. During the due diligence process for this investment is when the discovery of the Hauge Corp and Solterra October 2008 agreement stock exchange legal process omission was identified.  The term sheet requires resolving the defects with the transfer of the shares resulting from the Business Combination.

Solterra, Quantum Materials and Urban Resources Management, LLC are still working on a definitive agreement incorporating the term sheet which will be submitted with the Plan Supplement. Previously, considerable effort was expended developing operational plans, detailed financial analysis and benchmark measure metrics of development associated with this investment.  It is anticipated that the term sheet will be documented in the form of a convertible preferred stock arrangement with anti-dilution terms to facilitate future investments.ennted in the form of a convertible preferred stock arrangement with anti-dilution terms to facilitate future investments.

The Debtor's primary non-insider creditor is James Miller who has a convertible promissory note in the amount of $105,000. As of the Petition date, the Debtor owed $109,500 on the note and the claim is undisputed.

The Debtor as also involved in prepetition litigation styled as *James Edward Schloss v. Quantum Materials Corp., Stephen Squires, Robert Phillips and Does 1- 50* in the California Superior Court for the County of Riverside, Case No. PSC2002459 which was removed to the California Central District Bankruptcy Court and assisgned case number 6:2022ap01040 ("California Litigation").  The California Litigation was removed to the United States Bankruptcy Court for the Central District of California ("California Bankruptcy Court") after the bankruptcy was filed.  The Plaintiff alleged wage claims and a littany of other torts and fraud claims against the Debtor, Quatum Materials Corp, Stephen Squires and Robert Phillips. The Debtor had no ties to California and did not employ the Plaintiff. However, the Plaintiff alleged all of the defendants were alter egos. After the Plaintiff learned the Debtor was intending to file bankruptcy, the Plaintiff alleged the Debtor was not an indispensible party. In other words, acknowledged Solterra was not the alter ego of the other defendants. However, after the bankruptcy was filed, the Plaintiff proceeded to ask for a default judgment against the other co-defendants without dismissing or severing the Debtor. Each of the co-defendants would arguably have contribution and indemnity claims as to Solterra.  They have filed proof of claims. Further, continuing litigation against the co-defendants chills the ability to get investment.

The California Bankruptcy Court,remanded the case to the State Court at a hearing on July 28, 2022, although a signed order has not been entered. Arguably, there is appealable error related to the rulings on July 28, 2022. After considering the motion to remand, the California Bankruptcy Court ruled that Solterra was dismissed with prejudice.  As such, it is not anticipated that Solterra would take further action to appeal such rulings but reserves its rights regarding same. The California Bankruptcy Court admonished Plaintiff that if Plaintiff proceeded in State Court with actions that violate the stay that the Debtor could seek to enforce the stay in the main Bankruptcy case.  Debtor's counsel spoke with Plaintiff's counsel on July 28, 2022 regarding the issues and will provide further information to see if an agreement can be reached. If not, Debtor may reurge

the motion to enforce the stay[1]. The Plaintiff has not filed a proof of claim and has no pecuniary interest in the Debtor's Estate.

2.2. **<u>Summary of Plan</u>**.

As noted above, the Debtor and Quantum Materials Corp have had extensive discussions regarding financing and a licensing agreement with Quantum Materials Corp. Debtor has received terms sheets for review but any definitive agreements related to such discussions are still being negotiated and will be provided in a Plan Supplement and/or further amendments to this Plan.

Generally, the Plan is for a new investor to purchase equity in the Debtor. The mechanics of whether the equity will be purchased from the unissued outstanding shares of the Debtor or from Quantum will be determined by the definitive agreements. Solterra will be provided funding and in conjunction with that funding a license agreement with Quantum Materials Corp for certain technology to grow and expand its solary energy business.

In order to achieve financing and the license agreement with Quantum Materials, Crop, the Debtor needs to also resolve its issues with insider creditors because of the mutually beneficial aspect to the proposed financing deal and licensing agreement. The Debtor seeks by the terms of the Plan to settle and resolve any insider claims by providing releases and exculpation to the Released Parties with any claims of insiders deemed satisfied.

Quantum alleges a claim of about $720,654 for audit fees, rent, professional legal fees and services. The global settlement between the Debtor and Insider Creditors would require issuing 36,032,700 Shares of Solterra Common Stock and authorize 1,000,000,000 shares of Common Stock par value $0.001 to be issuable as well as authorizing 100,000,000 Shares of Preferred Stock par value $0.001 to become issuable. Quantum would also agree to enter into a licensing agreement with Solterra and Solterra would be provided funding from the Urban Resources Management investment which would be used to grow the Solterra business as discussed above.

The Plan contemplates Quantum, Squires and Phillips agree to waive and release any claims against the Debtor for contribution or indemnity related to the California Litigation if they consent to the Plan and vote in favor of the Plan with none of the Insider Creditors being entitled to distributions under the Plan as unsecured creditors.

As part of the consideration provided by Quantum Materials Corp and releases of Quantum Materials Corp in this Plan., the Plan contemplates that James Miller, the creditor with a note that matures August 19, 2022, will receive stock in Quantum Materials Corp. On information and belief, James Miller consents to this treatment.

The Plan also provides that the current equity issued and outstanding will be cancelled and reissued to Quantum Materials consistent with the terms of the Business Combination.

The Debtor is considering the appointment of an independent CRO or Director to assist in the day to day management of Solterra as part of the settlement terms which will be further outlined in the Plan Supplement.

| Class | Description | Treatment of Allowed Claims |
|---|---|---|
| N/A | Administrative Expense Claims | Administrative Expense Claims—Receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim (a) under the existing agreements between the Debtor and the holder of an Ordinary Course Administrative Expense Claim or (b) on the later of the fifteenth (15th) day after the Effective Date or fifteen (15) days after such claim becomes an Allowed Claim.<br><br>Non-Ordinary Administrative Expense Claims—Receive, in full satisfaction of such Claim, Cash payment from Distributable Funds in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the fifteenth (15th) day after the Effective Date or fifteen (15) days after such claim becomes an Allowed Claim. |
| N/A | Priority Tax Claims | Receive, in full satisfaction of such Claim, Cash payment from Distributable Funds in the amount of the Allowed Priority Tax Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. |

| Class 1 | Priority Claims | Receive, in full satisfaction of such Claim, Cash payments from Distributable Funds in the Allowed amount of such Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim. |
|---|---|---|
| Class 2 | General Unsecured Claims (Impaired) | James Miller shall receive equity in Quantum Materials in full satisfaction of the amounts owed by Solterra as part of the consideration Quantum Materials is providing for a settlement of the issues by and between the Debtor and Quantum. Insider Creditor shall receive no distribution for any unsecured claims. Any other unsecured claims shall be entitled to a pro rata share of any funds remaining after all administrative expenses and priority claims are paid from the cash the Debtor currently has on hand. None of the new investment funds shall be used for any payment to general unsecured creditors. |
| Class 3 | Unsecured Creditor – James Miller (Impaired) | James Miller shall receive equity in Quantum Materials in full satisfaction of the amounts owed by Solterra as part of the consideration Quantum Materials is providing for a settlement of the issues by and between the Debtor and Quantum. |
| Class 4 | Insider Creditor Claims (Impaired) | The Insider Creditor Claims shall receive no distribution and if they vote in favor of this plan then they consent to the settlement terms whereby the Debtor and Insider Creditors shall be mutually released from claims by and between the Debtor and Insider Creditors that arise or are related to claims that arose before the petition date or after up to the date of confirmation. |

The Plan also contains the following key provisions of which Creditors and parties-in-interest should take particular note:

a. <u>Voluntary Releases by and of the Releasing Insider Creditors</u>— In exchange for the consideration described herein, Releasing Insider Creditors, knowingly, voluntarily, fully, finally, irrevocably and forever releases and discharges the Debtor from any and all claims, counterclaims, crossclaims, grievances, disputes, controversies, violations, losses, debts, charges, causes of action, requests for relief, suits, demands, judgments, costs, and liabilities of every nature, kind, character or description whatsoever, both legal and equitable, known or unknown, foreseen or unforeseen, suspected or unsuspected, vested or unvested, absolute or contingent, that Releasing Insider Creditors asserted or could assert, held, holds or may hold against the Debtor which arose or are related to actions that occurred up to the Effective Date. In exchange for the consideration provided herein, Debtor mutually releases the Releasing Insider Creditors.

b. <u>Treatment of Executory Contracts and Unexpired Leases</u>— All executory contracts shall be deemed rejected.

c. <u>Discharge and Plan Injunctions</u>—The Plan provides that, upon the Effective Date, the Debtor shall receive a discharge and injunctions in support of the Plan and such Discharge.

d.  Exculpation and Injunction—The Plan provides for exculpation of Debtor, Reorganized Debtor, and its respective officers, directors, agents, advisors or Professionals with respect to liability to any holder of a Claim or Equity Interest, or any other party in interest, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of the Chapter 11 Case, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan, except for their acts or omissions constituting willful misconduct or gross negligence, as finally determined by a court of competent jurisdiction.

## 2.3.  **Liquidation Analysis.**

Under Bankruptcy Code §§ 1191 and 1129(a)(7), a plan can be confirmed without the accepting votes of impaired classes of claims as long as each such class would receive under the plan "not less than" they would receive "if the debtor were liquidated under chapter 7."

If this Chapter 11 Case were converted to chapter 7 and the assets of the Debtor liquidated, the Debtor's Estate would be administratively insolvent. The Debtor has only *de minimis* assets other than Cash and contingent litigation claims that would be available in a chapter 7 liquidation.

### 2.3.1.  Summary of Assets.

The Debtor filed its Amended Schedule A/B of its assets which is at ECF 14.

| Asset | Fair Market Value |
| --- | --- |
| Cash | $63,269.51 |
| Litigation Claims | Unknown |
|  |  |
|  |  |
| TOTAL | $63,269.51 |

### 2.3.2.  Summary of Liabilities.[7]

Based on analysis of the Debtor's books and records and the Proofs of Claims filed in the Chapter 11 Case, the Debtor estimates that its liabilities as of August 1, 2022 was around $945,000 plus the indemnification claims of insiders which if the Plan is approved would be released in the Plan as part of a compromise incorporated in the terms of the Plan which the Debtor requests be approved under Rule 9019.  Debtor's professional fees should be paid for by the retainer held by counsel. The amount of Subchapter V Trustee fees continues to accrue and an estimate will be provided in the Plan Supplement.

### 2.3.3.    Amount Available in Chapter 7 Liquidation.

Upon liquidation, the administrative claims and costs in a Chapter 7 would provide no recovery to general unsecured creditors.  It is anticipated claims objection would be necessary and contested incurring further administrative expenses. In addition, in the event of conversion, creditors who did not timely file a proof of claim would be able to file a claim.

## ARTICLE 3
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1.    **Administrative Claims and Priority Tax Claims.**

Bankruptcy Code § 1123(a)(1) provides that Administrative Claims and Priority Tax Claims shall not be classified for purposes of voting or receiving distributions under the Plan. All such Claims are to be treated separately as unclassified Claims on the terms set forth in Article 4 of the Plan.

### 3.2.    **Classes of Claims and Equity Interests.**

3.2.1.    The Plan classifies Claims and Equity Interests of the Debtor as follows:

| Class | Description (as Defined Herein) | Impairment | Voting |
|-------|--------------------------------|------------|--------|
| N/A | Administrative Expense Claims | N/A | No |
| N/A | Priority Tax Claims | N/A | No |
| Class 1 | Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | General Unsecured Claims | Impaired | Yes |
| Class 3 | Unsecured Creditor – James Miller | Impaired | Yes |
| Class 4 | Insider Creditor Claims | Impaired | Deemed to accept and consent unless opt-out |

## ARTICLE 4
## TREATMENT OF UNCLASSIFIED CLAIMS

### 4.1.    **Administrative Expense Claims**.

4.1.1.    Administrative Expense Claims. Non-Ordinary Course Administrative Expense Claims shall receive the following treatment:

4.1.1.1.    *Time for Filing Request by Holders of Administrative Expense Claims*. All holders of Non-Ordinary Course Administrative Expense Claims, other than Professional Persons holding Professional Fee Claims, shall file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Any such request must be served on the Debtor, its counsel, and the Subchapter V Trustee with no further service required, and must, at a minimum, set forth (i) the name of the holder of the Non-Ordinary Course Administrative Expense Claim; (ii) the amount of the Non-Ordinary Course Administrative Expense Claim; and (iii) the basis for the Non-Ordinary Course Administrative Expense Claim. A failure to file any such request in a timely fashion will result in the Administrative Expense Claim in question being

discharged and its holder forever barred from asserting such Administrative Expense Claim against the Debtor, its Estate, the Reorganized Debtor, the Subchapter V Trustee, or the Distributable Funds.

4.1.1.2.     *Administrative Expense Claims*. An Administrative Expense Claim for which a request for payment has been properly filed shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is twenty-one (21) days after a request for payment of such Administrative Expense Claim is filed. If an objection is timely filed, the Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

4.1.1.3.     *Payment of Administrative Expense Claims*. Except to the extent that a holder of an Administrative Expense Claim and the Debtor agree to a different treatment or such Claim was satisfied while the Chapter 11 Case was pending, each holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction of such Claim, Cash payment in the amount of the Allowed Administrative Expense Claim.

4.1.2.   Special Provisions for Professional Fee Claims. Every Professional Person holding a Professional Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order shall file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date; *provided*, *however*, that a Professional Person may supplement its request up to and including the date of the hearing on such request to account for fees and expenses incurred following the Effective Date in connection with, among other things, preparation of the request for allowance of such Professional Fee Claim, attendance at the hearing thereon and any other allowable fees or expenses not previously requested. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. The last date to object to any final fee application shall be the twenty-first (21st) day after such fee application has been filed with the Bankruptcy Court. Allowed Professional Fee Claims, not otherwise paid pursuant to any applicable interim compensation procedures, shall be paid in full agrees.

4.2.   **Priority Tax Claims**.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of such Claim, Cash payment in the amount of the Allowed Priority Tax Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim.

## ARTICLE 5
## ACCEPTANCE OR REJECTION OF THE PLAN

5.1   **Presumed Acceptance of Plan**.

Any Unimpaired Class under this Plan is conclusively presumed to accept this Plan. Any Class that voted to accept the Plan is presumed to accept this Plan.

5.2   **Presumed Rejection of Plan**.

Any Class that voted to reject the Plan or who will receive or retain no property under the

Plan is presumed to reject this Plan.

## ARTICLE 6
## IMPLEMENTATION AND EXECUTION OF THE PLAN

6.1 **Reorganized Debtor**.

6.1.1. <u>Continued Existence</u>. The Debtor shall continue to exist and operate its business as the Reorganized Debtor after the Effective Date. The Reorganized Debtor shall continue in business and shall carry on its business affairs without consultation or approval from the Bankruptcy Court. The Reorganized Debtor shall be free to use or sell its assets, hire, and compensate professionals and otherwise operate free of the restrictions, limitations and constraints existing under the Bankruptcy Code. The Reorganized Debtor shall operate in conformity with the Plan and shall make any required distributions and payments timely and in accordance with the Plan.

6.1.2. <u>Cancellation of Existing Securities and Reissuance to Proper Record Owner</u>. Except for the purpose of evidencing a right to distribution under the Plan and except as otherwise provided in the Plan on the Effective Date: (i) the obligations of the Debtor under each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtor or giving rise to any Claim or Interest shall be cancelled and certificate for 41,250,000 common shares issued to Quantum Materials Corp. and the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder to the cancelled shares or prior shareholders; and (ii) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor shall be released and discharged.

6.1.3. <u>Directors and Officers of the Reorganized Debtor</u>. As of the Effective Date, Stephen Squires will be joined on the Board by additional Board Members who will be named in the Plan Supplement.

6.1.4. <u>Corporate Action</u>. Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Court in all respects without any further corporate or equity holder action, including, as applicable: (1) the authorization, issuance, and distribution of the new equity securities; (2) appointment of the directors and officers for the Reorganized Debtor; and (3) all other actions contemplated by the Plan. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or Reorganized Debtor, as applicable.

6.2. **Vesting of Assets**.

On the Effective Date, all Property of the Estate, including, but not limited to any rights and Retained Causes of Action, whether under the Bankruptcy Code or any other applicable law, shall vest in Reorganized Debtor.

6.3.  **Preservation of the Debtor's Claims**.

All Retained Causes of Action shall be preserved and shall constitute Property of the Estate and shall be conveyed to Reorganized Debtor on the Effective Date. The Court shall retain jurisdiction to determine all such Retained Causes of Action until the entry of a Final Decree.

6.4.  **Preservation of Insurance**.

Nothing in this Plan, including the discharge or release of the Debtor provided in this Plan, shall diminish, or impair the enforceability of any insurance policies that may cover any Claims against the Debtor, the Reorganized Debtor, or any shareholder, officer, director, agent, professional, financial advisor or other Person covered by any insurance policy maintained by the Debtor.

6.5.  **Exemption from Stamp or Similar Taxes**.

In accordance with Bankruptcy Code § 1146(c): (a) the issuance, distribution, transfer or exchange of Reorganized Debtor's equity interests or other property of the Debtor's Estates; (b) the creation, modification, consolidation or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, on in connection with, this Plan or the Confirmation Order; (c) the making, assignment, modification or recording of any lease or sublease; or (d) the making, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, the Confirmation Order, or any transaction contemplated by any of the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax or stamp act or real estate transfer or mortgage recording tax, or any governmental assessment. The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

6.6.  **Effectuating Documents and Further Transactions**.

The Reorganized Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

6.7  **Objections to Claim**.

Except as is otherwise provided for with respect to Administrative Expense Claims, or as otherwise ordered by the Bankruptcy Court, objections to Claims and Equity Interests shall be prosecuted in accordance with the Bankruptcy Code and Bankruptcy Rules. Objection to Claims should be filed as soon as practicable, but in no event later than (a) ninety (90) days after the Effective Date or (b) other date set by the Court. The filing, prosecution, settlement, or withdrawal of all objections to Claims after the Effective Date are reserved to the sound discretion of Reorganized Debtor. If the claims are settled without the need of an objection, then the Debtor has full authority to settle without Court approval but shall file a notice of settlement or stipulation with the Court.

6.8 **Interest on Claims**.

> Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any non-tax claim.

## ARTICLE 7
## EXECUTORY CONTRACTS

7.1 **Executory Contracts Rejected**.

  7.1.1  Generally. All Executory Contracts and unexpired leases are rejected.

  7.1.2  Filing Proofs of Claim for Rejection Damages. Any Claims arising from the rejection of an Executory Contract or unexpired lease by this Plan shall be evidenced by a Proof of Claim filed on or before the date that is thirty (30) days after the Effective Date. A failure to file a Proof of Claim for Claims arising from the rejection of an Executory Contract or unexpired lease within such period will result in the Claim in question being discharged and its holder forever barred from asserting such Claim against the Debtor, its Estate or the Reorganized Debtor.

## ARTICLE 8
## EFFECT OF CONFIRMATION

8.1  **Binding Effect**.

Except as otherwise provided in Bankruptcy Code § 1141(d)(3), and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest the Debtor and inure to the benefit of, and be binding on, any such holder's respective successors and assigns, regardless of whether any Claim or Interest of such holder is impaired under this Plan or whether such Holder has accepted this Plan.

8.2  **Discharge of Claims against and Interests in the Debtor**.

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any successor, assign and affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtor, to the fullest extent permitted by Bankruptcy Code § 1141, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, upon the Effective Date, all such holders of Claims against or Interests in the Debtor, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to Bankruptcy Code § 105, 524 and 1141, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Reorganized Debtor.

8.3  **Pre-Confirmation Injunctions, Stays, Stipulations, and Discovery Orders**.

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Case, whether under Bankruptcy Code §§ 105 or 362 or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.4  **Injunction against Interference with Plan**.

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR, AND OTHER PARTIES IN INTEREST WHO RECEIVED ACTUAL OR CONSTRUCTIVE NOTICE OF THIS PLAN PRIOR TO THE CONFIRMATION HEARING, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

8.5  **Plan Injunction**.

EXCEPT AS OTHERWISE PROVIDED IN THIS PLAN OR IN THE CONFIRMATION ORDER, AS OF THE ENTRY OF THE CONFIRMATION ORDER BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE, WITH RESPECT TO ANY SUCH CLAIM OR INTEREST, PERMANENTLY ENJOINED AFTER THE ENTRY OF THE CONFIRMATION ORDER FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND

(INCLUDING ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING, DIRECTLY OR INDIRECTLY, THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR THE PROPERTY OF ANY OF THE FOREGOING, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (I) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (II) ENFORCING, LEVYING, ATTACHING (INCLUDING ANY PREJUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR THEIR PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (II) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (III) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (III) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (IV) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND (V) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY, OR IS INCONSISTENT, WITH THE PROVISIONS OF THIS PLAN; *PROVIDED*, *HOWEVER*, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS THE DEBTOR OR ITS ESTATE FROM EXERCISING THEIR RIGHTS, OR OBTAINING BENEFITS, PURSUANT TO, AND CONSISTENT WITH, THE TERMS OF THIS PLAN.

8.6     **Exculpation**.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER THE DEBTOR, REORGANIZED DEBTOR, NOR ANY OF THEIR RESPECTIVE PARTNERS, GENERAL PARTNERS, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR PROFESSIONALS HAVE OR MAY INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE MEMBERS OR FORMER MEMBERS, AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE CHAPTER 11 CASE, THE NEGOTIATION AND PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN (THE "CHAPTER 11 ACTIVITIES"), EXCEPT FOR THEIR ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION, AND IN ALL RESPECTS ARE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND

RESPONSIBILITIES IN CONNECTION WITH THE CHAPTER 11 ACTIVITIES. NO HOLDER OF A CLAIM OR EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, INCLUDING THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, HAVE ANY RIGHT OF ACTION AGAINST THE DEBTOR, REORGANIZED DEBTOR, OR ANY OF THEIR RESPECTIVE PARTNERS, GENERAL PARTNERS, OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AGENTS, ADVISORS OR PROFESSIONALS FOR ANY ACT OR OMISSION IN CONNECTION WITH THE CHAPTER 11 ACTIVITIES, EXCEPT FOR THEIR ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION.

8.7     **Injunction Related to Exculpation**.

TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CAUSES OF ACTION EXCULPATED PURSUANT TO THIS PLAN.

8.8     **Releases**.

8.8.1     Debtor Releases. To the fullest extent permitted by applicable law, upon the occurrence of the Effective Date, each Released Party and its respective property is conclusively, absolutely, unconditionally, irrevocably, and forever shall be deemed released, acquitted, and discharged by the Debtor, its Estate, and the Reorganized Debtor, from any and all Claims and causes of action, including any derivative claims asserted on behalf of the Debtor, that the Debtor, its estate, or the Reorganized Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or interest in, a Debtor or other entity, based on or relating to, or in any manner arising from or in connection with, in whole or in part:

8.8.1.1     The Debtor (including the management, ownership, or operation thereof), the Reorganized Debtor's in- or out-of-court restructuring efforts, and Retained Causes of Action;

8.8.1.2     The Chapter 11 Case; and

8.8.1.3     Any other related act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date.

## ARTICLE 9
## JURISDICTION

9.1     **Retention of Jurisdiction**.

The Bankruptcy Court shall retain and have all the jurisdiction conferred upon it by Bankruptcy Code, including all amendments thereof now existing or hereafter arising, and all amendments made to Title 28 of the United States Code after October 1, 1979. Without limiting the foregoing in any way, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case after the Confirmation Date in respect to the following matters to the fullest extent under applicable law:

a. To enable any party in interest (including the Reorganized Debtor) to consummate all proceedings that it may bring prior to the Confirmation Date to set aside Liens, or to recover any preferences, transfers, assets, Claims or damages to which said party may be entitled, or to reject any contracts and recover any property under the provisions of the Bankruptcy Code or other federal or state law;

b. To hear and determine all Claims, estimation of claims, and objections to Claims, including Claims arising from the rejection of any Executory Contract and any objections which may be made thereto;

c. To liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

d. To adjudicate all Claims to any Lien on any Property of the Estate or any proceeds thereof;

e. To recover all assets and Property of the Estate, wherever located, to the extent necessary for the consummation of the Plan;

f. To Allow, Disallow, or otherwise adjudicate any Claim;

g. To resolve any disputes pertaining to the terms and conditions of the sale of any Property of the Estate;

h. To resolve any disputes pertaining to the business operations of the Debtor during the pendency of the Chapter 11 Case;

i. To enter any orders which may be necessary or appropriate to modify, carry out or enforce the provisions of the Plan, including the injunctions provided for in the Plan;

j. To determine any defaults under the Plan, and the consequences of such default;

k. To resolve any disputes over the meaning of any provision of the Plan;

l. To make such determinations as are specifically provided in the Plan;

m. To hear and determine all requests for compensation and/or reimbursement of expenses which may be required under the Code, and not otherwise dispensed with under the Plan; and

n. To enter a final decree pursuant to Bankruptcy Code § 350 and Bankruptcy Rule 3022.

9.2 **Failure of Bankruptcy Court to Exercise Jurisdiction**.

If the Bankruptcy Court abstains or exercises discretion not to hear any matter within the scope of its jurisdiction, nothing herein shall prohibit or limit the exercise of jurisdiction by any other tribunal having competent jurisdiction over such matter.

## ARTICLE 10
## MODIFICATION OF PLAN

10.1 **Pre-Confirmation Modifications**.

The Debtor may propose amendments or modifications to the Plan at any time prior to the Confirmation Date, with leave of the Court and upon notice pursuant to Bankruptcy Code § 1193(a) and Bankruptcy Rule 3019

10.2 **Post-Confirmation Modifications**.

After the Confirmation Date, Modification of the Plan is permitted only upon Court order and only as authorized under Bankruptcy Code § 1193.

# ARTICLE 11
## GENERAL PROVISIONS

11.1 **Revocation, Withdrawal or Non-Consummation**.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if confirmation or consummation does not occur, then: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any other Person, or (iii) constitute an admission of any sort by the Debtor or any other Person.

11.2 **Severability of Plan Provisions**.

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.3 **Successors and Assigns**.

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

11.4 **Final Decree**.

The Reorganized Debtor or the Subchapter V Trustee shall file an application for entry of a final decree upon the distribution of all Distributable Funds.

11.5 **Notices**.

Unless otherwise provided herein, all notices or demands required or permitted hereunder shall be deemed to have been duly given and served when made in writing and (a) deposited in the

United States Mail in an envelope addressed to the last known address of the noticed party, with postage prepaid or (b) sent by electronic mail to an address indicated on a Proof of Claim or other document filed in the Bankruptcy Case. Any notices to be provided to the Reorganized Debtor shall be addressed as follows:

To the Reorganized Debtor:

> Attn: Stephen Squires
> 3055 Hunter Road
> San Marcos, Texas 78666
> ssquires@quantummaterialscorp.com
>
> With a copy to the attorneys for the
> Reorganized Debtor:
> Attn: Deirdre Carey Brown
> Forshey & Prostok LLP
> 1990 Post Oak Blvd Suite 2400
> Houston, Texas 77056
> dbrown@forsheyprostok.com

11.6 **<u>Governing Laws</u>**.

The Plan shall be governed by the laws of the State of Texas and the laws of the United States, as may be applicable.

11.7 **<u>Cramdown</u>**.

**<u>11.7.1</u>** The Debtor may request Confirmation of the Plan, under Bankruptcy Code § 1129(b).

**<u>11.7.2</u>** Subchapter V modifies the rules under which particular classes of claims can be crammed down. Subchapter V permits a court to disregard Bankruptcy Code § 1129(a)(10) and cram down a plan even if no impaired class of claims accepts the plan. Specifically, Bankruptcy Code § 1191(b) provides that if all the applicable requirements of Bankruptcy Code § 1129(a) are met other than subsections (a)(8), (a)(10), and (a)(15), the Bankruptcy Court can confirm the plan if:

**<u>11.7.2.1</u>** The plan does not discriminate unfairly against any impaired, non-consenting class.

**<u>11.7.2.2</u>** Is fair and equitable regarding each class of impaired claims or interests that has rejected the plan.

**<u>11.7.3</u>** The Debtor reserves the right to modify the Plan to the extent, if any, required for confirmation pursuant to Bankruptcy Code § 1129(b), as modified by Bankruptcy Code § 1191.

*[Signature Page Follows]*

**DATED:**      August 1, 2022.

                    Respectfully submitted,

                    **SOLTERRA RENEWABLE TECHNOLOGIES, INC.**

                    /s/ Stephen Squires
                    _____
                    By: Stephen Squires
                    Its: Chief Executive Officer
                    3055 Hunter Road
                    San Marcos, Texas 78666
                    ssquires@quantummaterialscorp.com
                    214-701-8779

Through its counsel:

  /s/ Deirdre Carey Brown
_____
Deirdre Carey Brown (SBN 24049116)
Forshey & Prostok LLP
1990 Post Oak Blvd Suite 2400
Houston. Texas 77056
Houston, TX 77002
Telephone: (832) 367-5722
Email: dbrown@forsheyprostok.com

**DATED:**     August 1, 2022.

Respectfully submitted,

**SOLTERRA RENEWABLE TECHNOLOGIES, INC.**

By: Stephen Squires
Its: Chief Executive Officer
3055 Hunter Road
San Marcos, Texas 78666
ssquires@quantummaterialscorp.com
214-701-8779

Through its counsel:

/s/ Deirdre Carey Brown
Deirdre Carey Brown (SBN 24049116)
Forshey & Prostok LLP
1990 Post Oak Blvd Suite 2400
Houston. Texas 77056
Houston, TX 77002
Telephone: (832) 367-5722
Email: dbrown@forsheyprostok.com